# EXHIBIT C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**MICHELLE REYNOLDS**, as Personal
Representative of the Estate of
**CODY REYNOLDS**, Deceased,

      Plaintiff,

v.

**OFFICER RYAN ADDIS** and
**CITY OF ROYAL OAK**,

      Defendants.

Case No. 2:18-cv-13669
Hon. Gershwin A. Drain
Mag. Judge Stephanie Dawkins Davis

---

**MOSS & COLELLA, P.C.**
By: A. Vince Colella (P49747)
     Victor Balta (P77805)
*Attorneys for Plaintiff*
28411 Northwestern Hwy., Ste. 1150
Southfield, Michigan 48034
P: (248) 945-0100
F: (248) 945-1801
E: vcolella@mosscolella.com
   vbalta@mosscolella.com

**SEWARD HENDERSON PLLC**
By: T. Joseph Seward (P35095)
     Kali M. L. Henderson (P76479)
*Attorneys for Defendants*
210 East 3rd Street, Suite 212
Royal Oak, Michigan 48067
P: (248) 733-3580
F: (248) 733-3633
E: jseward@sewardhenderson.com
   khenderson@sewardhenderson.com

---

## DEFENDANTS OFFICER RYAN ADDIS AND CITY OF ROYAL OAK'S NON-RETAINED EXPERT DISCLOSURE OF JASON D. PERNICK

NOW COME Defendants, **OFFICER RYAN ADDIS** and the **CITY OF ROYAL OAK,**

by and through their attorneys, and pursuant to Fed. R. Civ. P. 26(a)(2)(c) for their Non-

Retained Expert Disclosure of Jason D. Pernick, state as follows:

Expert's Name:

Jason D. Pernick, Oakland County Prosecutor's Office.

Subject Matter of
Testimony:

Ofc. Addis' Justified Use of Force/Constitutional Use of Force

Summary of Expected
Facts and Opinions:

Attorney and Prosecutor Pernick, of the Oakland County Prosecutor's Office, reviewed the investigative materials related to the May 14, 2018, incident involving Ofc. Ryan Addis and Cody Reynolds to determine whether any criminal charges should be brought against Ofc. Addis or, in the alternative, the shooting was justified. He reviewed the police reports; medical examiner materials; medical records of Douglas, Michelle, and Cody Reynolds; in-car videos; interviews; photographs; scene scan; and 911 call and radio traffic related to the incident. Based upon these materials, Mr. Pernick concluded that it was reasonable for Ofc. Addis to believe Mr. Reynolds posed an immediate threat of death or physical injury and the use of deadly force was reasonable because (1) Ofc. Addis was responding to the scene of a reported stabbing; (2) Officer Addis confronted Mr. Reynolds a short distance from the scene, and Mr. Reynolds was ordered to stop twice before he complied; (3) Mr. Reynolds answered affirmatively that he had stabbed somebody; (4) the knife could have been concealed by Mr. Reynolds and he would not respond as to where the knife was; (5) Mr. Reynolds hung his head, took a deep breath, and walked toward Ofc. Addis after being ordered to stop; (6) Mr. Reynolds momentarily moved toward the ground, then sprang up and lunged

2

at Ofc. Addis; (7) Ofc. Addis, believing he was about to be stabbed, braced himself and fired until Mr. Reynolds fell to the ground incapacitated and no longer a threat. Mr. Pernick documented his work, findings, and opinions in a report issued on August 15, 2018. That Report was attached to Defendants' Initial Disclosures as Exhibit 3, KH000060-KH000069. It is attached hereto as Exhibit 1.

Respectfully submitted,

**SEWARD HENDERSON PLLC**

/s/Michael A. Knoblock (P77544)
*Attorneys for Defendants*
210 East 3rd Street, Suite 212
Royal Oak, Michigan 48067
P: (248) 733-3580
F: (248) 733-3633
E: mknoblock@sewardhenderson.com

Dated:   August 8, 2019

## PROOF OF SERVICE

I hereby certify that I served the foregoing document and this Proof of Service upon all counsel of record, via U.S. First Class Mail and email, on **August 15, 2019.**

  /s/ Alexandra R. Lazarow
Alexandra R Lazarow
Administrative Assistant
**Seward Henderson PLLC**
admin-asst@sewadhenderson.com

3

# EXHIBIT 1



**Office of the Prosecuting Attorney**
**County of Oakland**

JESSICA R. COOPER
Prosecutor

Paul T. Walton
Chief Assistant Prosecutor

August 15, 2018

D/Sgt Robert Miller
Special Investigations Unit
Oakland County Sheriff's Office
1200 N. Telegraph Road
Pontiac, MI 48341

>       Re:     Officer Involved Shooting
>               Royal Oak Police Department
>               May 14, 2018

Dear Sgt. Miller:

At your request, we have reviewed the investigation into the officer involved use of force that resulted in the death of Cody Reynolds in Royal Oak on May 14, 2018.

<u>Investigative Materials Reviewed</u>

The following materials were reviewed:

Royal Oak Police Department (ROPD) Reports
CR 18-16755
CR 18-16790

Oakland County Sheriff's Office (OCSO) Reports
CR 18-89421
Forensic Laboratory Reports for Laboratory # 18-1307
        Request Number 0001: Scene Processing/Evidence Collection
        Request Number 0002: Firearms Evidence Examination
Computer Crimes Unit Examination Report

Oakland County Medical Examiner's Office (OCME)
Autopsy Report Case # 18-2990
OCME Toxicology Report
NMS Labs Toxicology Report for Work order 18160187

Letter to D/Sgt. Robert Miller
August 10, 2018
Page 2

Medical Records
Douglas Reynolds – Admission Date: 5/14/18
Michelle Reynolds – Admission Date: 5/14/18
Cody Reynolds – Various Admissions
      Admission Date: 5/14/18
      Admission Date: 2/25/17
      Admission Date: 11/15/15
      Admission Date: 2/18/14

ROPD In-Car Videos
      801 – Officer Ratliff
      802 – Officer Addis
      809 – Officer Staniszewski
      811 – Officer Platt
      818 – Lieutenant VanNess
      826 – Officer Desano

Interviews
      Officer Ryan Addis
      Officer John Tobin
      Hospital Interviews with Douglas and Michele Reynolds
      OCSO Interviews of Douglas and Michele Reynolds

OCSO Scene Photos
OCSO 3D Scan
OCME Photos
Photos by Detective Murray
Photos by Officer Ratcliff
Photos by Detective Barretto
ROPD 911Call and Radio Traffic

Additional Materials Reviewed
Oakland County Prosecutor's Office Case File: People v Cody Reynolds CR 17-263597-FH/PO 17-44709

<u>Description of Event</u>

In the early morning hours of May 14, 2018, Cody Reynolds, a 20 year old resident of Royal Oak, woke his parents who were asleep in their bedroom.  It appeared

Letter to D/Sgt. Robert Miller
August 10, 2018
Page 3

to Reynolds' parents that he was under the influence of some drug. He was described as "mumbling," "bizzare," and "psychotic."

Reynolds' father, Douglas Reynolds, tried to get his son to go into his bedroom and go to bed. Without warning, Cody Reynolds picked up a solid-body guitar, swung it like an axe and struck his father in the head. While Mr. Reynolds went into the bathroom to tend to the resulting gash, Cody went into the kitchen where he found his mother. He picked up a steak knife that was on a counter and according to Mrs. Reynolds tried to hide that knife behind his arm. Mrs. Reynolds was able to take the knife and put it on a counter. Cody picked up another knife and stabbed his mother in the chest. He then walked out of the house into the back yard.

Mr. Reynolds went outside after his son while Mrs. Reynolds called 911. She told the call taker that her son had just stabbed her and that her husband was also hurt. She said that her son was outside in the back yard.

At 03:11:33[1], Royal Oak police units were advised that a stabbing had occurred at 1027 Hoffman involving a mother and son. Officer Ryan Addis, assigned to vehicle 802, acknowledged receiving the information and immediately drove toward the Hoffman address. Enroute, dispatchers advised that the suspect was Cody, the 20 year old son, that he was in the backyard of the home and that dad was believed to have been stabbed in the forehead. It took Officer Addis about 90 seconds to reach the area. Approaching the Reynolds home from the east, he turned west on E. Hudson from northbound Campbell.[2]

Officer Addis had driven west for a short distance when he saw a man on the north side of the street between two parked cars. He stated that it looked like the man was trying to get into one of the cars. The man stepped into the street as the police car approached and Officer Addis could see that it was a young man who was not wearing shoes.

Given the close proximity to the scene of the stabbings, the early morning hour and the similarity in description of the suspect, Officer Addis stated that he believed the person he saw was the suspect in the stabbing, who was at that point about 280 feet from the back yard of the Hoffman address.

---

[1] Times are expressed in military time. Thus, 03:11:33 is 3:11AM and 33 seconds.
[2] 1027 Hoffman is located on the northeast corner of Hoffman and E. Hudson. Hoffman is the third street west of Campbell. E. Hudson runs east and west off Campbell.

Letter to D/Sgt. Robert Miller
August 10, 2018
Page 4

Officer Addis stopped his car in the street and shined a spotlight on Reynolds who began walking toward the police car.[3] Reynolds was wearing a long sleeve pull over and pants. The shirt was not tucked into the pants. Although Reynolds' hands were empty, Officer Addis stated that he could not tell whether Reynolds had a knife or some other concealed weapon. He drew his .40 caliber Glock service pistol and ordered Reynolds to stop.

Reynolds ignored the order to stop and continued walking toward Officer Addis. The officer again told Reynolds to "stop right there." Reynolds took a couple of more steps toward the officer and then stopped. Officer Addis asked Reynolds if he was the one that had stabbed somebody. Reynolds nodded and said "Yes." See ROPD Vehicle 802 in-car video.

Officer Addis told Reynolds to put his hands on his head. Reynolds took a deep breath, dropped his head and walked several more steps toward the officer. Officer Addis again ordered Reynolds to stop and to put his hands on his head. Reynolds complied but by the time he did so, he was just a few feet from the officer. See ROPD Vehicle 802 in-car video. Officer Addis stated that he stepped out and away from the patrol car in order to increase the distance between the two men.

Officer Addis ordered Reynolds to get down on the ground where he said he intended to hold Reynolds until other officers could arrive to assist. Officer Addis stated that Reynolds dropped to his knees with his arms in front of him. On the in-car recording, Officer Addis can be heard asking Reynolds if he still had the knife. Reynolds did not answer. Reynolds was on the ground for about two seconds when, without warning, he sprang up and lunged at Officer Addis. According to Officer Addis, Reynolds said "fuck it" as he charged at him.

Officer Addis quickly back-pedaled away from Reynolds. He stated that he tucked his pistol into his chest in order to prevent Reynolds from grabbing his firearm and braced, expecting that Reynolds was going to stab him in the neck. Reynolds continued coming at the officer and in response Officer Addis fired his pistol until Reynolds stopped charging him and fell to the ground.

---

[3] Officer Addis' car, like those of the other marked Royal Oak units that responded, was equipped with an in-car recording system. A dash mounted camera provided video and interior audio recording while a microphone worn by the officer provided additional audio recording.

Letter to D/Sgt. Robert Miller
August 10, 2018
Page 5

As indicated by the in-car video, the shooting occurred approximately 33 seconds after Officer Addis first pulled onto E. Hudson.

Officer Addis kept Reynolds at gunpoint until other officers arrived. The officers then provided first aid until Reynolds was turned over to Royal Oak Fire Department paramedics. Reynolds was taken to Royal Oak Beaumont Hospital where he was eventually declared dead.

## Autopsy and Toxicology

An autopsy was conducted by Dr. Bernardino Pacris, M.D., Oakland County Deputy Medical Examiner, at the Oakland County Medical Examiner's Office. Dr. Pacris found that Reynolds sustained four gunshot wounds. There was one entrance wound in the chest and three in the back. None of the wounds would have been immediately incapacitating or fatal. The wounds did not exhibit soot or stippling, indicating that the gun was fired from a distance of greater than three feet. Three fired bullets were recovered during the autopsy. Those were turned over to the sheriff's Forensic Laboratory for analysis.[4]

Dr. Pacris could not determine the chronological sequence of the wounds but based upon the trajectory of the wound to the chest, found that it was apparent that this was the first wound sustained. After entry, the bullet travelled through the left chest and left lung before lodging in the left back. As was explained by Dr. Pacris the path of this bullet was front to back and downwards and is consistent with Reynolds springing up from his hands and knees and lunging at Officer Addis.

Blood samples taken during the autopsy were examined for the presence of drugs or alcohol. No alcohol was found, however, psilocin was found in Reynolds' blood. Psilocin is the active hallucinogenic component of psilocybin, a compound that occurs naturally in about a dozen species of mushrooms. Both psilocin and psilocybin are classified as DEA Schedule I hallucinogens.

---

[4] The fired bullets collected on autopsy were examined by the OCSO Forensic Laboratory and compared to Officer Addis' service pistol along with five fired shell casings and one fired bullet that were collected at the scene of the shooting. Officer Addis' pistol was found to have fired all five shell casings. While the fired bullets could not be conclusively identified as having been fired by the officer's pistol, all of them exhibited similar class characteristics that indicated that they could have been fired by the Glock pistol.

Letter to D/Sgt. Robert Miller
August 10, 2018
Page 6

Dr. Daniel Isenschmid, Ph.D., is a forensic toxicologist employed by NMS Labs which analyzed the blood samples for the presence of psilocin. Because there is no reference data available for blood psilocin concentrations, the test results report only the qualitative presence of psilocin. However, Dr. Isenschmid indicated that the testing revealed psilocin concentration in Reynolds' blood at 2.5 times above the reporting limit.

Psilocybin mushrooms are hallucinogenic and produce profound changes in consciousness and perception for 4-6 hours after consumption with peaks effects occurring 2-3 hours after ingestion. These effects vary widely based upon the mindset of the person consuming the mushrooms and the setting that they are in – the people around them and their environment. (Dr. Isenschmid, citing Psilocybin Mushrooms Fact Sheet, January 2017, published by the Drug Policy Alliance).

Eli Lowell was interviewed during the course of the investigation. He told detectives that he was with Reynolds along with two other friends on the night of the shooting. Lowell said that Reynolds consumed two grams of psilocybin mushrooms at some point during the evening and then wanted to go home to experience the effects. Lowell said that during the ride home, he and Reynolds had an intense philosophical argument about the nature of "love and religion." Lowell said that Reynolds was "worked up" about the how young people and religion were perceived.

When they had arrived at Reynolds' home, Lowell said to Reynolds "I love you, bro," as Reynolds was getting out of the car. Reynolds replied "Do you really?"

Lowell said that when he dropped Reynolds off he believed that Reynolds was affected by the mushrooms but he was not concerned about his friend. Lowell described the hallucinogenic effects of psilocybin as "coming in waves."

Lowell was unwilling to discuss what he knew about where the mushrooms came from. All Lowell would say was that he had allowed Reynolds to keep the drugs at his home so that Reynolds' parents would not find them.

Lowell described Reynolds as someone who never spoke badly of his parents. Lowell said that Reynolds often talked about how much he loved his parents and how appreciative he was of their support.

Letter to D/Sgt. Robert Miller
August 10, 2018
Page 7

Reynolds' Background

Reynolds has a history of depression and attempted suicide. In February, 2014, Reynolds was hospitalized for depression and self-inflicted cutting marks on his wrist. Reynolds reported that he was angry because his parents had found his marijuana.

However, Mrs. Reynolds indicated that she was afraid to leave him alone for fear that he may hurt himself.

In November, 2015, Reynolds was hospitalized for a suicide attempt following a break-up with his girlfriend. On admission, Reynolds said that he had taken 35-40 Xanax pills and drank two beers. At some point, Reynolds said that he thought about hurting both himself and others.

On February 25, 2017, at about 10:30pm, Reynolds was driving the wrong way on Woodward in Royal Oak. He collided with a vehicle turning onto Woodward. The driver of that vehicle sustained extremely serious injuries. Investigating officers found Reynolds to be highly intoxicated. A quantity of marijuana along with a marijuana grinder was found in the vehicle. A blood test found Reynolds to have a blood alcohol level of .247.

Reynolds was convicted of OWI Causing Serious Injury. That offense is a felony punishable by up to five years in prison. Reynolds was sentenced to two years' probation and six months in the county jail. Upon release from jail Reynolds was required to wear an alcohol tether and not use drugs or alcohol. While conventional drug screening would reveal the use of alcohol or marijuana, those screens would not typically test for the presence of psilocin.

A search of Reynolds' bedroom after the shooting revealed one other item that might provide some insight into what he was experiencing that morning. Royal Oak Police Detective Carl Barretto assisted the sheriff's office in processing the scene. While searching Reynolds' bedroom, Det. Barretto found and photographed a handwritten note on a desk in the room. On the note was written "1/3 I understand." Below that the word "love" was written and then crossed out. At the bottom of the note was written "I hate my life."

KH000066 - Initial Discls

Letter to D/Sgt. Robert Miller
August 10, 2018
Page 8

## Analysis

At issue here is whether Officer Addis was legally justified in his use of lethal force. The question is whether the officer, based upon the circumstances, had an honest and reasonable belief that lethal force was immediately necessary in order to protect himself from death or serious injury.

Michigan law provides that an individual may use deadly force against another with no duty to first retreat if "The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or to another individual." MCL 780.972(1) (a). When deciding if Officer Addis acted in lawful self-defense, his conduct must be judged according to how the circumstances appeared to him at the time he acted.

The Michigan Model Criminal Jury Instructions set forth the law regarding use of force in self-defense. CJI 7.15 provides a three-part test for reviewing the use of force in a situation like this one.

First, at the time he acted, [Officer Addis] must have honestly and reasonably believed that he was in danger of being killed or seriously injured. **If [his] belief was honest and reasonable, he could act immediately to defend himself even if it turned out later that he was wrong about how much danger he was in.** (Emphasis added). In deciding if [Officer Addis'] belief was honest and reasonable, you should consider all the circumstances as they appeared to [him] at the time.

Second, a person may not kill or seriously injure another person just to protect himself against what seems like a threat of only minor injury. [Officer Addis] must have been afraid of death or serious physical injury. When you decide if [Officer Addis] was afraid of . . . these, you should consider all the circumstances: the condition of the people involved, including their relative strength, whether the other person was armed with a dangerous weapon or had some other means of injuring the officer, the nature of the other person's attack or threat and whether [Officer Addis] knew about any previous violent acts or threats made by the other person.

Third, at the time he acted, [Officer Addis] must have honestly and reasonably believed that what he did was immediately necessary. Under the law, a person may only use as much force as he thinks is necessary at the time to protect himself. When you decide whether the amount of force used seemed to be necessary, you may consider whether [Officer Addis] knew about any other ways of protecting himself, but you may also consider how the excitement of the moment affected the choice the defendant made.

CJI 7.15 Use of Deadly Force in Self-Defense

Letter to D/Sgt. Robert Miller
August 10, 2018
Page 9

Here, Officer Addis was responding to a report of two people being stabbed by their 20 year old son. Within seconds of receiving that call, Officer Addis confronted the suspect a short distance from the scene. Reynolds was walking toward the officer and was twice ordered to stop before he complied. When asked if Reynolds was the one who had stabbed somebody, Reynolds nodded and said "yes."

Given this information, it was reasonable for Officer Addis to assume that Reynolds was armed. The knife Reynolds used to stab his parents could have been concealed under Reynolds' shirt, in his shirt sleeve or in his pants and when asked where the knife was, Reynolds would not answer. Until Officer Addis could ensure that Reynolds was unarmed, his decision to deploy his pistol in order to defend himself against the possibility of an immediate deadly attack was reasonable as well.

Reynolds' subsequent behavior added to Officer Addis's belief that Reynolds was armed. Reynolds hung his head, took a deep breath and started walking toward Officer Addis after having been ordered to stop. Reynolds was again ordered to stop, then to put his hands on his head and to get down on the ground. He did so momentarily, only to spring up and lunge at Officer Addis while saying "fuck it." Officer Addis stated that he backed away, bracing himself because he believed that he was about to stabbed in the neck and began firing. He continued firing until Reynolds fell to the ground, incapacitated and no longer a threat.

The evidence supports Officer Addis' belief that Reynolds posed an immediate threat of death or serious physical injury and that his use of force was immediately necessary to protect himself.

The law does not require a person to retreat in the face of a sudden and violent attack or where the person reasonably believes that an attacker is about to use a deadly weapon. See MCL 780.972(1) and CJI 7.16 Duty to Retreat to Avoid Using Deadly Force. Likewise, a person may legally use lethal force to stop an attacker who turns out to be unarmed if the person attacked reasonably believes that the attacker was armed. See CJI 7.15 Use of Deadly Force in Self-Defense. Thus, in the face of a sudden, violent attack by a person who had reportedly just stabbed two people and who was reasonably presumed to be armed, Officer Addis could immediately respond with lethal force because it was apparently necessary to prevent his death or serious injury.

Letter to D/Sgt. Robert Miller
August 10, 2018
Page 10

## Conclusion

Having reportedly just stabbed his parents, Officer Ryan Addis confronted Cody Reynolds walking away from the scene of the assaults. Reynolds disregarded Officer Addis' initial orders to stop and continued walking toward him. Officer Addis tried to back away from Reynolds and ordered him to the ground. Reynolds complied only briefly before he suddenly and without warning, sprang up and lunged at Officer Addis. Believing that he was about to stabbed by Reynolds, Officer Addis began firing and continued firing until Reynolds no longer posed an apparently deadly threat.

The evidence produced by your investigation supports the conclusion that Officer Addis had a reasonable belief that Cody Reynolds posed an immediate threat of death or serious physical injury. The officer's use of force was therefore reasonable under the circumstances even though it turned out later that Reynolds was no longer armed with the knife that he had used to stab his mother. Thus, Officer Addis was acting in lawful self-defense. The death of Cody Reynolds therefore constitutes justifiable homicide and as a result no criminal charges will be authorized in connection with this case.

With the exception of the Prosecutor's Office case file in People v Cody Reynolds, CR 17-263597/PO 17-44709, I am returning the investigative materials that were submitted for review.

Respectfully,

Jason D. Pernick
Chief, Warrants Division

JDP/ad
cc: File