UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHELLE REYNOLDS, as Personal
Representative of the Estate of CODY
REYNOLDS, Deceased,

          Plaintiff,

                                        Case No.: 18-cv-13669

v.                                     Honorable Gershwin A. Drain


OFFICER RYAN ADDIS, *et al.*,

          Defendants.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [#63] AND DISMISSING CITY OF ROYAL OAK

## I.    INTRODUCTION

In this 42 U.S.C. § 1983 excessive force case, Defendants move for summary judgment arguing that former Royal Oak Police Officer, Defendant Ryan Addis, is entitled to qualified immunity for using lethal force against Plaintiff Michelle Reynold's son, Cody Reynolds.  Defendants further assert that Plaintiff is not entitled to relief on her *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978) claim against Defendant City of Royal Oak because Addis did not violate Mr. Reynolds's Fourth Amendment rights and there is no evidence of any illegal policies or customs, or a failure to train that led to Addis's use of deadly force.

Defendants also argue that Addis is entitled to governmental immunity with respect to Plaintiff's assault and battery claim and, finally, they maintain her claim alleging gross negligence fails because Plaintiff cannot allege a gross negligence claim based on intentional acts.

Plaintiff filed a Response to Defendants' Motion for Summary Judgment and Defendants filed a Reply in support of their motion. A hearing was held on June 25, 2020. For the reasons that follow, the Court will grant in part and deny in part Defendants' Motion for Summary Judgment.

## II.     FACTUAL BACKGROUND

In the early morning hours of May 14, 2018, the Royal Oak Police Department ("ROPD") Dispatch Center received a 911 call from Michelle Reynolds. Police Officer John Tobin answered Ms. Reynolds's call. She reported that her son had possibly taken some drugs and had stabbed her and her husband. She informed Tobin that her son was in the backyard and that the knife was in the kitchen. Tobin can be heard yelling information to other dispatchers; however, he fails to relay the critical information that the suspect had left the home without the weapon. While the ROPD Dispatch had a silent call feature wherein all staff in the dispatch office could have heard the call without the need to yell information, this feature was not utilized at the time.

Addis, a three-and-a-half-year veteran at the Royal Oak Police Department, was working road patrol that morning and responded to the dispatch call. Dispatch reported a stabbing at 1027 Hoffman and indicated further information was forthcoming.  Addis's in-car video and audio were both working.  En route to the location, Addis learned the stabbing was between a mother and son, but dispatch was not sure who was stabbed. Dispatch also informed Addis that "they're both still there," and "sounds like the dad was stabbed also in the forehead" and "the son is the suspect in the backyard right now." Addis was the first officer to arrive on the scene.

Addis activated his spotlight which allowed him to see Mr. Reynolds walking towards Addis's patrol vehicle.  Mr. Reynolds eventually comes to a stop in the street as Addis approaches in the patrol car.   Mr. Reynolds is clearly standing with his empty hands at his sides.  Addis got out of his car and remained by the open driver's side door.  He observed Mr. Reynolds begin to walk towards his vehicle and told him to stop.  Addis has described Mr. Reynolds's behavior as "very strange" and "very slow and almost zombie like."   He apparently knew something was off about the young man, who was twenty years old, and later determined to be high on Psilocin, commonly referred to as "mushrooms." Addis described him as "emotionless," having a "blank" or "thousand-yard stare" on his face looking "very sullen or dejected."

Addis positioned himself just outside his vehicle, behind his door with his weapon drawn and pointed at Mr. Reynolds.  Addis told Mr. Reynolds to "stop right there."  Mr. Reynolds initially ignored his command, but later stopped as directed by Addis.  In response to Addis's question if he was the "one that just stabbed someone," Mr. Reynolds responded, "yeah" and appeared to hang his head in shame.  He began to walk towards Addis, who yelled "stop." Mr. Reynolds stopped and complied with Addis's command to put his hands on his head.  Mr. Reynolds got down on his knees as directed by Addis and extended his hands in an inexplicable "worship pose."  In an attempt to create space, Addis then took a big step to the left and one step backwards, so a 45-degree turn with his firearm still pointed at Mr. Reynolds.

Addis asked Mr. Reynolds if he still had the knife on his person, but Mr. Reynolds did not answer.  Instead, he quickly got up from his crouched position, allegedly yelled "f**k it" and ran toward Addis.  However, Mr. Reynolds is outside of camera view at this point and it is unclear from the video what Mr. Reynolds yelled while he ran off camera.  As Mr. Reynolds begins to run, Addis fires two shots and then three more shots in rapid sequence. All that can be seen on camera are the bullet casings from Addis's weapon.

Addis has described his reaction:

4

I tucked my gun towards my chest, braced up my shoulders, kind of hunched up towards my neck and began to try and backpedal as fast as I could.

I did [fire the weapon].  When he continued to run right at me, he was probably an arm's length away or so.  And because I thought that he was going to stab me in the neck or try and grab my weapon, I fired as I continued to backpedal away and kind of on an angle towards the other curb.

Addis claims he never saw Mr. Reynolds turn his back to him. Nor did Addis observe Mr. Reynolds make any furtive movements or gestures suggesting he was hiding a weapon.  During Addis's recorded interview with the Sheriff, he claimed that Mr. Reynolds fell "face first, and land[ed] with his hands under him." Addis further stated that, at that point, "I still don't know what he has in his hands, if anything."

Addis holds a Bachelor of Science degree in Criminal Justice, completed a four-month training program at the Oakland Police Academy and received specialized training as a member of the SWAT team. In another instance, Addis employed non-lethal force by deploying a Taser on an armed, mentally ill suspect posing an active danger to potential hostages.  The Department has a computerized testing system for internal policies and procedures, where officers are tested on their knowledge of the policies after they have reviewed them, including Officer Addis.

The evidence regarding the Department's 911 dispatch center reveals that calls are answered by one of three people: the front desk officer, the on-duty supervisor, or the dispatchers (one police dispatcher or one fire dispatcher).  The desk officer typically takes the call and relays information to the dispatcher who then relays the information to the officers.  The call taker can type information received during the call into a computer or by sharing it verbally.  It appears the verbal method was employed by the ROPD because it was quicker.  The call takers do not have certain questions they always ask, rather they prioritize questions based on the circumstances of each call.  Officer Tobin, who took the 911 call from Plaintiff, states that whether the suspect was still armed was not critical "because a weapon was already used in this case.  So I needed to get a description of the person.  But once the weapon has been used, the officers need to use precaution just like he would still be armed."

A few months before Mr. Reynolds's death, the State 911 Committee conducted a compliance review of the ROPD's 911 system.  The 911 Committee found no issues with any of the areas reviewed, including training of dispatchers, functionality of the system, and the dispatch process employed by dispatchers.

The Chief of Police, Corrigan O'Donohue, testified that outside of a statement made by Tobin, he was not aware of any complaints with the dispatch system.  However, Tobin has maintained that the dispatch system was terrible

because it used multiple persons yelling information to one another which risked the loss of key information.

An autopsy was conducted after Mr. Reynolds's death, and a report prepared. The report noted that Mr. Reynolds was 5 feet, 9 inches tall and weighed 146 pounds. The report further advised that there was one shot with an entrance wound in the front left chest and three shots with entrance wounds to the right upper back, mid-back and right lower back. There was no soot or stippling present for any of the wounds. The shot to the chest was most likely not fatal, but the shot to the mid-back which fractured the spine's T9 thoracic vertebrae and severed the thoracic aorta was likely the fatal shot—even with immediate medical attention.

The Oakland County Sheriff's Office investigated the incident and turned its findings over to the Oakland County Prosecutor for review. The Prosecutor ultimately concluded that Addis reasonably and honestly feared for his life when he discharged his firearm.

According to Dr. Pacris, who performed the autopsy, a person can turn their torso 180 degrees in .6 seconds. Defendants have hired an expert, Robert Genna, who has reconstructed the shooting. Genna concluded that Mr. Reynolds was 12 to 14 feet from Addis and could have closed the distance between them in less than a second based on the typical running ability of a twenty-year old male. Dr. Pacris

believes that the shots to Mr. Reynolds's back occurred due to rapid twisting by Mr. Reynolds after lunging forward.

Plaintiff relies on expert Daniel Spitz, M.D., who opines that Addis's account of events is "inconsistent with the forensic evidence." Specifically, Dr. Spitz concluded that "at the time Mr. Reynolds was shot in the back, his body position was [with] his back toward Officer Addis." Additionally, Plaintiff's use of force expert, Scott DeFoe, a twenty-eight-year law enforcement veteran with Purple Heart and LAPD Medal of Valor commendations, opines that a reasonable officer in Addis's position would not have believed he was in an immediate threat to his life to justify the use of deadly force. Moreover, DeFoe notes several actions taken by Addis that were inconsistent with proper police procedure, such as: failing to monitor Mr. Reynolds before backup arrived when he knew they were all on their way, failing to advise Dispatch that he was exiting his vehicle to engage with Mr. Reynolds, failing to have any plan for non-lethal use of force such as verbal de-escalation, physical strength and non-compliance techniques, Taser, baton or OC spray, failing to give Mr. Reynolds a verbal warning that he would fire his service weapon with a reasonable opportunity to comply, failing to holster his weapon when he observed no weapon in Mr. Reynolds's hands which would have alleviated any concern that Mr. Reynolds would attempt to obtain the firearm if non-lethal Taser, baton or OC spray proved ineffective to gain control. DaFoe also

opines that the ROPD Dispatch system failed to abide by its own policies concerning 911 calls by failing to advise the responding officers that Mr. Reynolds no longer had the knife on his person.

On April 10, 2018, or thirty-four days before Mr. Reynolds's death, another Royal Oak Police Officer was involved in the lethal use of force. Similar to the circumstances here, the Prosecutor found the officer acted reasonably in using deadly force against citizen Antonino Gordon and a separate review board was convened to review the matter, just as in Mr. Reynolds's case.  In the Gordon case, one of the dispatchers falsely reported shots had been fired at an officer.  She also failed to communicate the weapon status of the suspect at large.

Both Mr. Reynolds's and the Gordon case remain in "draft form" despite a ten-day deadline to conclude the report.  The Chief explains this is because there is always "potential for new evidence."  The Board of Review's report for the use of deadly force in Mr. Reynolds's case likewise remains in draft form despite the ten-day deadline because of the same "potential for new evidence."  The critical use of force form is missing from Mr. Reynolds's investigation, even though Chief Donahue admits this form is required for all investigations.  The only mandatory meetings that took place at the Police Department after Mr. Reynolds's death were "grief counseling" for the officers.

## III.   LAW & ANALYSIS

### A.  Standard of Review

Federal Rule of Civil Procedure 56(a) "directs that summary judgment shall be granted if there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 779 (6th Cir. 1998) (quotations omitted). The court must view the facts, and draw reasonable inferences from those facts, in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). No genuine dispute of material fact exists where the record "taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Ultimately, the court evaluates "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

### B.  Fourth Amendment & Qualified Immunity

Defendant Addis argues his conduct during the encounter with Mr. Reynolds was constitutional and it did not exceed the bounds of clearly established law.

Qualified immunity "shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Chapman v. Brown*, 814 F.3d

447, 457 (6th Cir. 2016) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). In determining whether a law enforcement officer is entitled to qualified immunity on an excessive force claim, two questions must be evaluated. *Kent v. Oakland Cty.*, 810 F.3d 384, 390 (6th Cir. 2016). The first inquiry in the qualified immunity analysis is whether, based on the facts alleged and considered "in the light most favorable to the party asserting the injury," the official's conduct violated the plaintiff's constitutional rights under the Fourth Amendment. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).

If the district court finds a Fourth Amendment violation, the next step is to determine whether the right was clearly established at the time of the incident. *Id.* at 202. The district court may address the qualified immunity analysis in any order. *Kent*, 810 F.3d at 390. The plaintiff bears the ultimate burden of proof, *Garretson v. City of Madison Heights*, 407 F.3d 789, 798 (6th Cir. 2005) (citation omitted), and if the plaintiff fails to carry her burden as to either element of the qualified immunity analysis, then Officer Addis is immune from suit. *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 494 (6th Cir. 2012).

Claims alleging the use of excessive force during an arrest are considered under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 396 (1989). Utilizing this standard, the Court must determine whether Addis's "actions are "objectively reasonable in light of the facts

and circumstances confronting [hi]m, without regard to [his] underlying intent or motivation." *Id.* at 397. To make this determination, the Court must balance the following three factors enunciated by the *Graham* court: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. "The ultimate question, however, is whether the totality of the circumstances justifies a particular sort of seizure." *Kent v. Oakland Cty.*, 810 F.3d 384, 390 (6th Cir. 2016). The district court "must take into account the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation."*Id*

The use of deadly force is limited to situations in which the "officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officers or to others." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). Defendant Addis relies on the following authority in support of his argument that he had probable cause to believe Mr. Reynolds posed a threat of serious physical harm to him: *Mullins v. Cyranek*, 805 F.3d 760 (6th Cir. 2015); *Stevens-Rucker v. City of Columbus*, 739 F. App'x 834, 842 (6th Cir. 2018), *Davenport v. Causey*, 521 F.3d 544 (6th Cir. 2008), *Steele v. City of Cleveland*, 375 F. App'x 536 (6th Cir. 2010); *Mitchell v. Schlabach*, 864 F.3d 416 (6th Cir. 2017) and *Reich v. City*

*of Elizabethtown*, 945 F.3d 968 (Dec. 19, 2019).[1]  The Court disagrees with Defendants' assertion that each case involves "dangers like those Of[ficer] Addis faced." ECF No. 63, PageID.2086.

The *Mullins* case is distinguishable because it involved a gun drawn in a physical struggle with a suspect in a crowded shopping center.  Defendants misconstrue *Mullins* by suggesting the plaintiff in *Mullins* was unarmed because the Court explicitly relied on this fact, noting that "Mullins brandished a firearm" within seconds of being shot. *Id*. at 768.  Thus, the *Mullins* court relied heavily on the severity of the crime finding that it weighed in favor of the officer because the suspect brandished a previously concealed firearm in the officer's presence without the officer's permission, struggled with the officer for over one minute, and threw the firearm even though he was told to drop it.  *Id*. at 767.  "Importantly, all of these events transpired in the early evening hours in a breezeway leading into Fountain Square, a populated city square with shops, restaurants, hotels, and offices in downtown Cincinnati." *Id.*

The facts in *Stevens-Rucker v. Columbus*, 739 F. App'x 834 (6th Cir. 2018) are unlike the circumstances facing Addis where the suspect in that case was armed with a knife when he broke into an apartment, left and later returned.  *Id*. at 836.

---

[1] *Reich* was decided after Defendants filed their Motion for Summary Judgment. Thus, Plaintiff has not had an opportunity to discuss *Reich* and its impact, if any, on the issues before the Court because Defendants first discussed *Reich* in their Reply brief.

When one of the officers arrived on the scene, he saw the knife in the suspect's back pocket. *Id*. The officer drew his Taser while keeping his gun aimed; but the suspect refused to get on the ground. *Id.* at 837. The officer used his Taser, yet "immediately as [the suspect] hit the ground, he was popping back up." *Id.* When he popped back up, he was holding the knife and that is when the officer fired four shots, which missed the suspect who ran away. *Id.* Other officers arrived on the scene, and the suspect again brandished a knife, was unaffected by Taser deployment and began moving towards one of the officers. *Id.* The officers then fired three non-lethal shots and the suspect fled. *Id.* at 838. Eventually one of the officers caught up with the suspect, who was still holding the knife, and shot him twice killing him. *Id.* These circumstances are so unlike the evidence present here that this case also provides no support for Defendant's position.

The decision in *Mitchell* is likewise distinguishable because it involved a drunk driver who led the sole officer on duty on a chase through residential neighborhoods at dangerous speeds and as high as 100 miles per hour while driving on the highway. *Mitchell*, 864 F. 3d at 421. The suspect in *Mitchell* then later charged the officer and said that the officer would "have to f---ing shoot [him]." *Id*. at 422. When the suspect had closed the gap "'somewhere between 10 and 21 feet,' [the officer] fired a shot at" the suspect, who "hunched over slightly, but continued moving purposefully toward" the officer. *Id*. Then, "[l]ess than one

second after firing the first shot and after taking two more steps back, [the officer] fired again." *Id.*  The second shot caused the suspect to collapse.  *Id.*  He later died. *Id.  Mitchell* is therefore unlike the crime here where the suspect there had "knowingly placed himself, [the officer] and the public at risk of severe injury or death" by driving erratically and at dangerously high speeds through residential neighborhoods and on the highway. *Id*. at 421.  Additionally, in concluding that the suspect "posed a serious threat to [the officer]'s safety, the court noted that the suspect continu[ed] charging at the officer, ignored officer commands, and had closed the gap between them considerably.  *Id.* at 422. However, different than the circumstances facing Defendant Addis, the suspect in *Mitchell* continued charging the officer after the first shot.  *Id.*  The forensic evidence before this Court suggests that after the first shot, Mr. Reynolds turned and began retreating.  Thus, he no longer posed a serious threat to Defendant Addis.  Because "it was only after [the officer] fired the second shot that Mitchell recoiled and began to retreat[,]"the officer "had 'probable cause to believe that the suspect pose[d] a significant threat of death or serious physical injury' when he fired both shots.  *Id.* at 422 (citing *Garner*, 471 U.S. at 3*); see also Mullins*, 805 F.3d at 768 ("When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity.")[2]

---

[2] Defendants' remaining authority is factually dissimilar and fails to support

Based on a review of Defendants' cited authority, it is evident that these cases do not involve "dangers like those Of[ficer] Addis faced" as represented by counsel.  ECF No. 63, PageID.2086.  All of the authority provided by Defendants either involves an armed assailant or a prolonged encounter where non-lethal attempts to subdue the suspect were unsuccessful or both circumstances.

It is well settled that where multiple shots are fired and some of those shots are to a suspect's back, even a suspect armed with a knife and allegedly charging an officer, creates a question of fact for the jury on whether excessive force has occurred.  *See Samples v. City of Atlanta*, 846 F.2d 1328 (11th Cir. 1988). In *Samples*, the responding officer alleged that he saw the plaintiff "screaming like a demented person in a phone booth."  *Id*. at 1331.  The officer got out of his patrol car and questioned the plaintiff, who threw a soda bottle, drew a knife, and opened it."  *Id.*  The officer claimed that he "feared for his life and shot" the plaintiff

---

Defendant's position that Officer Addis's conduct was that of a reasonable officer under the totality of the circumstances.  *See Steele v. City of Cleveland*, 375 F. App'x 536 (6th Cir. Apr. 28, 2010) (suspect repeatedly slid hand down his right-side disobeying police orders to keep "hands in plain view" and later dove back "into his vehicle" and that is when the officer "saw Steele grab a gun."); *Davenport v. Causey*, 521 F.3d 544 (6th Cir. Apr. 4, 2008) (suspect exhibited aggressive behavior, use of a Taser did not work and suspect struck the officer and started pulling the Taser away from the officer and when back up arrived the suspect assaulted multiple officers); *Reich v. City of Elizabethtown*, 945 F.3d 968 (6th Cir. 2019)(suspect was wielding a knife in stabbing position; officers knew suspect was severely schizophrenic and hated police and suspect yelled "you're gonna have to kill me mother****er" right before officers used deadly force)

because "instead of listening [to the command to stop opening the knife]," the plaintiff moved even closer to the officer. *Id*. The officer claimed he continued to shoot until the plaintiff turned around, took a few steps, and fell to the ground. *Id*. at 1331-32.

The *Samples* court ultimately concluded that there were material questions of fact necessitating the need for a jury to decide whether (1) the knife automatically closed itself or whether the plaintiff never opened it, (2) whether the plaintiff's small size made the deadly force unjustified; and to determine (3) how one of the five bullets struck the plaintiff in the back:

> Finally, we note that one of the bullets struck Samples in the back. This raises a serious issue of fact. Of course, it is possible that the force of the first four bullets spun Samples around, so that the fifth struck him in the back. However, it is also possible that after Samples turned to run away, [the officer] continued shooting. Another possibility is that the first shot hit Samples in the back, and this so angered Samples that he turned around and started running at [the officer]. In either of the latter two scenarios, serious issues of fact exist regarding the question of excessive force. We do not have to determine which version of the story is most likely to have occurred. All we should note is that they are possible on the facts before us.

*Id*. at 1333-34. Similar to the circumstances in *Samples*, whether Addis shot Mr. Reynolds when he had turned away and was no longer a threat is a question of material fact for the jury's determination.

In *Gaddis v. Redford Twp*., 364 F.3d 763 (6th Cir. 2004), the Sixth Circuit relied on *Samples* to require justification for shots fired into the back of a suspect.

The drunk driving suspect in *Gaddis* was pulled out of his vehicle when he retrieved a knife from his pockets.  *Id*. at 766-67.  The responding officers ordered him to drop the knife, but he resisted pepper spray and being grabbed by the officers.  *Id*.  He eventually stabbed at one of the officers, which resulted in multiple shots being fired by the officers.  *Id*.  The *Gaddis* court found *Samples* was good law, however, it distinguished the facts before it because the plaintiff did not just merely possess a knife, but he had attempted to stab one of the officers. *Id.* Moreover, the fact that the plaintiff had been shot by multiple officers from different vantage points after his attempt to stab one of them was sufficient to grant judgment in the officers' favor.  *Id.*  These facts are distinguishable from those facing Addis.  Specifically, Addis never observed Mr. Reynolds with a knife nor did Mr. Reynolds attempt to stab Addis and Addis was the only officer on the scene.  Thus, the shots to Mr. Reynolds's back support that he was shot while unarmed, fleeing, and when he no longer posed a threat to Addis.  *See also Bunch v. Village of New Lebanon*, Nos. 94-4098; 94-4141, 1995 U.S. LEXIS 13608,*7-8 (6th Cir. May 31, 1995) (denying summary judgment even though the defendant claimed that he reasonably feared for his safety where the forensic evidence called into question the officer's account of the incident and there was physical evidence showing the victim was shot in the back).

Moreover, the "fact that a situation is rapidly evolving does not, by itself permit an officer to use deadly force." *Godawa v. Byrd*, 798 F.3d 457, 461 (6th Cir. 2015). *Id*.  In *Godawa*, the decedent was parked outside a bar when the defendant-officer approached.  The officer asked some questions and went to retrieve a notebook when he claims that the decedent began rapidly backing out of his parking spot.  *Id*.  The video evidence did not show the moment of impact; thus it was unclear whether the decedent was driving at the officer or whether the officer was moving towards the vehicle.  *Id*. at 461-62. The officer can be heard over the police radio stating that "he ran over my bike, he tried to hit me." *Id*.  During litigation, the officer claimed that the decedent hit him in the knee with his car.  *Id.*  Because a jury could reasonably find that the officer was "chasing [the decedent]'s car before he fired the shot that killed [him] and that he was not in harm's way at that critical moment[,]" summary judgment in favor of the officer was inappropriate.  *Id.*

Similarly, looking at the evidence in the light most favorable to the non-moving party, a jury could reasonably conclude that Mr. Reynolds was running on an angle towards the driveway and not charging Addis and that he was fleeing when he was shot.  *See also Hermiz v. City of Southfield*, 484 F. App'x 13, *16 (6th Cir. May 21, 2012) (concluding that "[a] reasonable jury drawing inferences . . . could determine that an officer that aimed and fired shots while to the side of the

vehicle – including a shot fired far enough from the side to shatter the driver's side window – would have had time to realize that he was no longer in the path of the car and no longer in immediate danger.").

Here, there is a question of material fact for the jury to decide whether Addis was justified in firing all of the shots, including the shots to Mr. Reynolds's back, when he clearly saw Mr. Reynolds had nothing in his hands and did not make any gestures as if he was reaching for a weapon.  Although Defendants would like the Court to adopt wholesale Addis's version of the deadly encounter, this is antithetical to Rule 56.  Plaintiff has presented evidence calling into question Addis's version of events with Dr. Spitz's findings, the autopsy report, DaFoe's report and the video from Addis's patrol car.  Based on the foregoing analysis, the jury must decide material questions of fact in order to assess whether Officer Addis's actions amounted to an unreasonable seizure under the Fourth Amendment.

Finally, the law is well settled that shooting an unarmed fleeing suspect is excessive force when the officer and nearby persons are not in immediate danger. *Garner*, 471 U.S. at 11.  Based on the foregoing considerations, Defendant Addis is not entitled to qualified immunity from civil liability damages.

### C.  *Monell* Claim

The City argues it is entitled to summary judgment because Plaintiff cannot establish the City's failure to train its staff regarding proper 911 dispatch procedure resulted in a constitutional violation. The City also argues that Plaintiff cannot establish the City's failure to train on the use of deadly force resulted in a constitutional violation.

Plaintiff's § 1983 claim against the City must "demonstrate that the alleged federal violation occurred because of a municipal policy or custom." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)); *see also Miller v. Sanilac Cnty.*, 606 F.3d 240, 254–55 (6th Cir. 2010). Plaintiff must make this showing by demonstrating one of the following:

> (1) the existence of an illegal official policy or legislative enactment;
> (2) that an official with final decision-making authority ratified illegal actions;
> (3) *the existence of a policy of inadequate training or supervision*; or
> (4) the existence of a custom of tolerance or acquiescence of federal rights violations.

*Burgess*, 735 F.3d at 478 (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (emphasis added)). "A municipality 'may not be sued under § 1983 for an injury inflicted solely by its employees or agents.'" *Id*. (quoting *Monell*, 436 U.S. at 694).

To succeed on a failure to train or supervise claim in the Sixth Circuit, a plaintiff must prove the following:

(1) the training or supervision was inadequate for the tasks performed;
(2) the inadequacy was the result of the municipality's deliberate indifference; and
(3) the inadequacy was closely related to or actually caused the injury.

*Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Regets v. City of Plymouth*, 568 Fed. App'x. 380, 394 (6th Cir. 2014) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997)).  There are two ways to demonstrate deliberate indifference.  A plaintiff could "show prior instances of unconstitutional conduct demonstrating that [a city] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury."  *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008) (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)).  In the alternative, a plaintiff could show "a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation . . ." *Id*. (quoting *Bryan Cnty*., 520 U.S. at 409); *see also Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1244 (6th Cir. 1989); *Marchese v. Lucas*, 758 F.2 181 (6th Cir. 1985); *Hays v. Jefferson County*, 668 F.2d 869, (6th Cir. 1982) (concluding that "a municipality may be held liable only where there is essentially a complete

22

failure to train the police force, or training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result.") (internal citation omitted).

In this case, Plaintiff is proceeding on a failure to train claim. She therefore must demonstrate a (1) failure to train or supervise, (2) deliberate indifference, and (3) relatedness. *See Ellis ex rel. Pendergrass*, 455 F.3d at 700. Thus, if the evidence presents sufficient disagreement about whether there was a failure to train or supervise ROPD officers, summary judgment is improper at this juncture. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52.

As to Plaintiff's argument concerning the failure to train on the use of force, the City argues that Plaintiff has "failed to present any evidence that Royal Oak acted willfully, recklessly, or grossly negligent in investigating after the fact to support such an inference of pre-incident policy." ECF 80, PageID.3034. The Court agrees that Plaintiff has failed to come forward with any evidence of a clear and persistent pattern of unconstitutional conduct of which the City was aware and failed to take adequate measures in response. When Addis used deadly force, the City assigned the case to the prosecutor's office for investigation, as well as conducted its own internal review through the Review Board. While the use of deadly force occurred twice in 2018, this is insufficient to show that the City disregarded a known or obvious pattern of unconstitutional deadly force.

As to the aspect of Plaintiff's *Monell* claim asserting deficient 911 call policies, Plaintiff argues that the readily available silent call feature supports *Monell* liability.  Plaintiff maintains that the failure to transmit information during a 911 call has the "highly predictable consequence" of omitting vital information resulting in injury to civilians.  *Bd. Of Comm'rs v. Brown*, 520 U.S. 397, 409 (1997).

As to the 911 Dispatch System, the Court concludes that Plaintiff again fails in her burden to demonstrate a material question of fact exists for the jury's consideration.  There is no evidence that the City was on notice with respect to problems associated with its 911 system or training.  In fact, the State's 911 Committee conducted an audit a few months prior to Mr. Reynolds's death and found no issues with respect to the ROPD's 911 Dispatch system, its functioning or staff use of the system.  While Officer Tobin commented that the system was problematic because it required officers to yell critical information to one another, this complaint was never expressed to any final decisionmaker prior to the incident giving rise to this litigation.  Rather, Chief O'Donohue had never heard any complaints concerning the dispatch system until the Oakland County Prosecutor's Office conducted its investigation on the use of deadly force against Mr. Reynolds and Officer Tobin raised his complaint.  As such, there is nothing in the record suggesting that the City should have been on notice concerning problems with the

911 dispatch system.  The failure of Officer Tobin to use the silent call feature reflects poor procedure, but it does not rise to the level of an unlawful policy or custom.  Accordingly, Defendant City is entitled to summary judgment on Plaintiff's *Monell* claim.

### D.   State Law Claims

#### 1.  Assault and Battery

Defendant Addis further argues that he is entitled to governmental immunity under Michigan law because his actions were reasonable, and he acted in good faith.

Under Michigan law, governmental employees are entitled to immunity for their intentional torts if (1) the employee's challenged acts were undertaken in the course of employment, (2) the acts were undertaken in good faith, and (3) the acts were discretionary rather than ministerial.  MICH. COMP. LAWS § 691.1407(2)(c)(3); *Odom v. Wayne Cty.*, 482 Mich. 459, 463; 760 N.W.2d 217 (2008).  A "lack of good faith," which is the sole issue on this claim, has been defined as "malicious intent, capricious action or corrupt conduct" or "willful and corrupt misconduct[.]"  *Id*. at 474.  This can include "conduct or a failure to act that shows such indifference to whether harm will result as to be equal to a willingness that harm will result."  *Id.* at 475.

Here, Addis admitted he could see Mr. Reynolds's hands and never saw Mr. Reynolds make any furtive movements, he knew Mr. Reynolds was no longer any threat to his parents, he failed to obtain critical information concerning the location of the knife, failed to develop any plan and deployed deadly force against a suspect who was small in stature and visibly acting unusual.  The evidence also suggests that Addis turned and tracked Mr. Reynolds as he was retreating towards the driveway when three shots were fired in his back.  Defendant is not entitled to governmental immunity because there is sufficient evidence for a jury to conclude he lacked the requisite good faith for his conduct.

### 2.  Gross Negligence

Finally, Defendants argue that Plaintiff's gross negligence claim fails because Michigan courts reject a plaintiff's attempt to transform the elements of an intentional tort into a claim of gross negligence.  *VanVorous v. Burmeister*, 262 Mich. App. 467; 262 N.W.2d 467 (2004).  However, Defendants do acknowledge that the *Bell v. Porter*, 739 F. Supp.2d 1005 (W.D. Mich. 2010) court rejected the expansive view of Michigan law espoused by the *VanVorous* court by holding that a plaintiff could bring a gross negligence claim based on an officer's breach of duties similar to the allegations asserted by Plaintiff Michelle Reynolds, namely that Addis had a duty to "avoid conduct so reckless as to demonstrate a substantial lack of concern as to whether injury resulted."  ECF No.1, PageID.8; *see also*

*Richards v. Peters*, 788 F. App'x 324 (6th Cir. Sep. 17, 2019) (rejecting Defendant's argument that *VanVorous* barred the plaintiff's gross negligence claim noting that "[t]his court has sustained gross-negligence claims premised on allegations that officers were 'grossly negligent in failing to follow certain procedures and statutory obligations' or where the plaintiff can otherwise 'show that the defendant owed him a duty of care.'")(quoting *Brent v. Wayne Cty. Dep't of Human Servs*., 901 F.3d 656, 700-01 (6th Cir. 2018), cert. denied, 139 S.Ct. 1551 (2019)).

Here, Plaintiff has produced expert evidence that Addis departed from established protocols regarding the use of force and use of deadly force.  He further opined that Addis rushed into the situation without having any plan nor did he employ any de-escalation procedures.  This evidence is sufficient to withstand Rule 56 dismissal in Defendant Addis's favor on this claim.

## IV.   CONCLUSION

Accordingly, for the reasons articulated above, Defendants' Motion for Summary Judgment [#63] is GRANTED IN PART and DENIED IN PART.

Count II and Defendant City of Royal Oak are HEREBY DISMISSED.

SO ORDERED.

Dated:  July 24, 2020                                    /s/Gershwin A. Drain
                                                        GERSHWIN A. DRAIN
                                                        United States District Judge

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
July 24, 2020, by electronic and/or ordinary mail.
/s/ Teresa McGovern
Case Manager